FREMONT CANNING CO. *v.* PERE MARQUETTE RAILROAD CO.

1. PARTIES—ACTIONS—JOINT VENTURES—PARTNERSHIP.

While it appeared that plaintiff and another firm were jointly interested in the shipping and selling of peaches, and plaintiff attended to the buying and loading, the other firm to selling the peaches for one-half the profits, plaintiff was rightly permitted to recover for the failure of defendant railroad company to provide sufficient cars, pursuant to a preliminary order and arrangement with the plaintiff with whom the contract relations for shipping freight were concluded by defendant, the evidence showing, also, that damages were claimed for peaches which the plaintiff was forced to can and in which the other firm was not jointly interested.

2. CARRIERS—FREIGHT—DELAY IN FURNISHING CARS.

Where plaintiff claimed that it ordered refrigerator cars from defendant railroad company in which to ship peaches, having, previously to the order, advised defendant that a large number of cars would be needed to move the crop in that vicinity, that defendant neglected to provide refrigerator cars as they were needed and requested, so that plaintiff had to can the peaches and was compelled to use inferior and soft fruit, evidence tending to sup-

port the claims was properly submitted to the jury as a question of fact, under the terms of Act No. 300, Pub. Acts 1909 (3 How. Stat. [2d Ed.] § 6531).

3. SAME—TRIAL—INSTRUCTIONS.

It was also proper to charge the jury that the dispute was whether the cars were furnished, as requested, and if they were not furnished, whether there was a reasonable excuse; that the goods were perishable, that defendant's duty was not confined to furnishing cars for the village that plaintiff shipped from, that the railroad could not discriminate and must treat all shippers alike, that it was plaintiff's duty to do everything it could to take care of peaches which were left on its hands by reason of defendant's failure to furnish cars, that if it used such peaches in the canning factory and they had deteriorated in value and plaintiff suffered damages accordingly, the verdict should be for that amount, provided the damage resulted from defendant's failure to furnish refrigerator cars, that it was no defense that persons who should have furnished ice for the cars failed or neglected to provide ice, nor was it a sufficient defense that defendant placed more cars at the point of shipment during the season than plaintiff ordered if defendant failed to furnish cars on the dates for which plaintiff ordered them.

4. DAMAGES—MITIGATION—CARRIERS.

Where plaintiff showed that, because of the failure of a common carrier to furnish refrigerator cars for shipping peaches, plaintiff sustained a loss and was obliged to use soft peaches in its canning factory, and that it minimized the damages by saving such fruit as was fit for canning, claiming as a part of its damages the waste resulting from the defective peaches, defendant could not complain of the measure of damages adopted.

5. EVIDENCE—WRITTEN CONTRACT—BILL OF LADING—RAILROADS.

Although bills of lading which were not shown to be genuine were incompetent as evidence of delivery of the freight to the carrier, any error committed in receiving them was cured by the reception in evidence of receipted freight bills covering the same ground and showing the same facts.

6. CARRIERS—NEGLIGENCE.

It was also proper to submit to the jury plaintiff's claim

that the cars were delayed in transit to the place of con-
signment, supported by its testimony and contradicted by
evidence offered by the defendant.

7. SAME—WEIGHT OF EVIDENCE.
   *Held,* that there was evidence supporting a verdict for
   plaintiff's entire claim and the judgment should not be
   reversed as excessive.

Error to Newaygo; Barton, J.  Submitted January
23, 1914.  (Docket No. 76.)   Decided April 7, 1914.
Rehearing denied June 4, 1914.

Case by the Fremont Canning Company against
the Pere Marquette Railroad Company for damages
to freight, delay in shipments and in providing cars,
etc.  Judgment for plaintiff.  Defendant brings error.
Affirmed.

*Parker, Shields & Brown (Seward. L. Merriam,
John C. Bills,* and *William J. Branstrom,* of counsel),
for appellant.

*Hall & Gillard,* for appellee.

STONE, J.  This is an action of assumpsit brought
to recover damages upon three separate and distinct
causes of action, which are set forth in three separate
counts.  Counsel upon both sides, in presenting the
questions to be considered, have treated the counts
separately, and we will attempt to pursue that course
in disposing of the case.

In and by the first count of the plaintiff's declara-
tion it alleges that in 1911 it was engaged in carry-
ing on the business of canning fancy fruits and vege-
tables, and also buying and selling fruits at whole-
sale and in car lots, and had its principal place of
business at the village of Fremont, Newaygo county.
The declaration alleges that the country adjacent to
the village of Fremont, at the time mentioned was,

and for some time prior thereto had been, largely devoted to the raising of fruits, and particularly to the raising of large quantities of peaches, and during the season of harvesting the said fruit large quantities of peaches were shipped to various points outside of Fremont by the defendant; that during the summer of 1911 plaintiff contracted with the fruit growers of Fremont and vicinity for the delivery of large quantities of peaches to be delivered to it when they should be harvested, and agreed to pay said farmers a specified price therefor, said peaches to be delivered to the plaintiff at Fremont, some to be canned and packed by the plaintiff in its factory, and some to be shipped by the plaintiff to the wholesale trade at various points in Michigan in car load lots; that as the season advanced it became apparent to plaintiff that, owing to the large crop of peaches, there would be a special need of good transportation facilities to properly dispose of said peaches when they should be harvested and delivered to the plaintiff as aforesaid; that early in the month of August, 1911, it notified the defendant, in writing, of the conditions of the peach crop in Fremont and vicinity by a letter written by Frank Gerber, the manager and treasurer of the plaintiff, to one Frank Frisby, the local agent of the defendant. company at Fremont. That letter was as follows:

"August 2, 1911.

"Frank Frisby,
    "Fremont, Michigan.
"*Dear Sir:*
    "Referring to our conversation relative to the peach crop and the necessity for better service than we have ever had before, beg to say that the more we think of this matter, the more we are impressed that to move this crop and prevent very serious losses, it will be necessary that we have different and better train service than we have had in previous years. We are addressing this letter to you and shall ask the

other fruit shippers to sign same and would request that you forward the letter with your comments to the proper official of your company.

"The peach crop this year will be far greater than any previous season, and, as we are driving in the country daily, and having this peach crop in mind, we observe large numbers of small orchards which are coming into bearing and which we have never known about before. The aggregate of the crop from these young orchards are of varieties that mature during about the middle of the regular peach season, so that there is going to be a time when the movement will be extremely heavy, although we believe there will be several cars to move every day from this point from the day the season opens until it is finished.

"It seems to us that this business is of sufficient importance to your company to warrant special services with a train starting from Muskegon in time so as to place refrigerators here about 7:00 a. m.. and returning leave White Cloud at 1:00 or 2:00 p. m., and get through here around the middle of the afternoon, or in time so that connections could be made with your trains out of Muskegon.

"Trusting that you will give this matter your immediate attention, and with best wishes, we remain,
"Yours respectfully."

This letter was also signed by E. L. Boyd, Fred Marshall, and others purporting to be fruit shippers. The following reply was received signed by F. Hartenstein, superintendent of the defendant at Grand Rapids, Mich., viz.:

"August 26th, 1911.

"MR. FRANK GERBER, Mgr.,
  "Fremont Canning Company,
       "Fremont, Michigan.
"*Dear Sir:*
"Your letter to our agent at Fremont relative to the handling of fruit business at that station has been referred to me.

"I do not think that after it is well started there will be any reason for complaint by any of the fruit shippers between White Cloud and Muskegon. I am

contemplating putting in a train service there that
will fulfill the requirements.

"Yours truly,

"F. HARTENSTEIN,

"Superintendent.

"Copy to Mr. W. H. Romoser, Mr. W. J. Quinlan,
Mr. F. Frisby."

The declaration further alleges that peaches are a
highly perishable commodity, and can be safely ship-
ped only in refrigerator cars, properly iced, and will
spoil if not so shipped, and not placed under ice very
shortly after they have been harvested; that this is
especially true as the peach harvesting season begins
during the latter part of August, when the weather is
very warm, and peaches require quick handling and
good refrigeration in order to keep them from spoil-
ing, all of which facts were known to the defendant;
that the plaintiff had been in the canning business
for a number of years, and had gained a reputation
among the trade for canning and packing only first-
class fruit, and especially a first-class brand of
peaches; that the defendant, in consideration that
the plaintiff should deliver to it by way of its busi-
ness as common carrier aforesaid the peaches which
it should ship in car loads, undertook and promised
that it would furnish to the plaintiff at the places
designated by it, and at the times designated by it,
all of the refrigerator cars needed by it to load the
peaches into for certain compensation and reward.
It is complained that, notwithstanding the duty of the
defendant, it wrongfully, unlawfully, and negligently
failed and refused to place at the plaintiff's disposal
for loading peaches the number of refrigerator cars
ordered by it on the date for which they were ordered,
and wrongfully and negligently failed to deliver some
of the cars for two or three days after the same were
ordered, placed some of the cars for loading in the
nighttime, when they should have been placed in the

morning preceding the night; that, by reason of the wrongful conduct and neglect of the defendant, great quantities of peaches were delivered to the plaintiff which it had no way of shipping; and, before the cars ordered by the plaintiff of the defendant had been placed by the defendant, the peaches had become so soft that they could not be shipped, and were unsalable in their condition, and would have been a total loss but for the acts of the plaintiff hereinafter stated.

Plaintiff avers that when the cars did not arrive it was unable, because of defendant's wrongful acts, to put the peaches in the cars and on ice; that the peaches had begun to deteriorate, and would have been totally spoiled when the cars did arrive; that the plaintiff, therefore, took the peaches that were beginning to deteriorate in value because of defendant's wrongful acts and used them in its factory, canning and packing them, and thereby saving said peaches from being a total loss, and did everything in its power to make defendant's loss, occasioned by its own wrongful act, as light as possible.

The declaration further avers that, had it not been for the wrongful acts of defendant above mentioned, plaintiff would not have been obliged to have canned and packed anything but a first-class quality of peaches, but, owing to the fact of the wilful, wrongful, and negligent acts of the defendant aforesaid, it was obliged to and did can and pack the peaches which had deteriorated, and thereby the enviable reputation of the plaintiff as a canner and packer of a first-class brand of peaches was injured and greatly damaged; that, by endeavoring to make the defendant's loss as light as possible, and using in its factory the peaches which had deteriorated, it became and was necessary to use many more bushels of peaches than it would have taken if it had been able to use a first-class quality of peaches to obtain the same number of cans; that

180 MICH.—19.

plaintiff had to pay its contract price for the peaches, as they were first-class when they were delivered, and would not have canned any but first-class peaches if the defendant had delivered the cars as it should have done, whereby the plaintiff paid out large sums of money for good peaches; and, solely because of the wrongful acts of the defendant as aforesaid, said peaches deteriorated in value, and the plaintiff suffered heavy losses thereby to its damage.

As we understand the plaintiff's position, it is that the damage which it seeks to recover under the first count of its declaration is the loss which it claims it sustained by reason of being obliged to can peaches that had become soft by reason of the neglect and delay of the defendant in furnishing refrigerator cars. The plaintiff offered testimony tending to show the amount of damage sustained by it on account of its having to can the soft peaches in order to prevent such peaches from being a total loss. This testimony was given, in the main, by Mr. Gerber, manager and treasurer of plaintiff, who testified that he had had many years' experience in the business at that place, and the testimony tended to show that the loss occasioned by the failure of the defendant to furnish cars promptly made it necessary to can 3,337½ bushels of peaches, or over 10 per cent. more than it would have taken had the peaches been in good condition for canning. Estimated at a loss of 9¼ per cent. on the amount, brought a total loss under this count, as claimed by the plaintiff, of $1,656.03, which was the amount of damage plaintiff claimed under the first count.

The record in this case is very voluminous, and it will be impracticable to quote any considerable portion of the testimony.

Upon the trial of the case it was the claim of the defendant that there could be no recovery in the case, because it appeared that Loveland & Hinyon Com-

pany should have been joined as a plaintiff in the case. That claim is based mainly upon what appeared in the examination of the witness Gerber. He testified on direct examination as follows:

"We made arrangement with Loveland & Hinyon Company for the shipping of peaches, a joint account arrangement. This joint account arrangement contemplated that Loveland & Hinyon Company would attend to the selling of the peaches. We would attend to the buying and loading, and then we were to divide whatever profit was made in the operation. This arrangement was made about August 18th. Up to that time the Fremont Canning Company had purchased or made contracts for approximately 15,000 bushels, and very few had been delivered. * * * I cannot say accurately without my records how many peaches were required by the canning company to be used in its factory during the season of 1911. Under our arrangement with Loveland & Hinyon Company the canning company was to take whatever peaches were required for our canning operation from the peaches purchased by the joint account. We were first to take those before any were shipped. As the peaches were brought in each day, they were placed on our platform. We kept the factory in operation, taking such peaches as were required for the operation of the factory, and the remainder were supposed to be put in the refrigerator cars and shipped. The peaches were loaded into refrigerator cars the day they were brought in, if cars were available. After the 2nd of August our field man estimated that 300 cars of peaches would be shipped. I had numerous conferences with Mr. Frisby in regard to that, and we gave him our ideas from time to time as the season progressed as to the extent of the crop. * * * When the cars were placed and loaded, they were billed out. The instructions as to the billing were given by Loveland & Hinyon Company. * * *

"Q. Whether or not you could on all of these days have had good peaches to run through the canning factory, peaches in good condition?

"A. We could have used the sound peaches as they came in to the exclusion of those that we had on hand.

"Q. Why did you use the soft peaches?

"*A.* Why, to minimize the loss; to keep it down.

"*Q.* Whose loss?

"*A.* The loss of all concerned.

"*Q.* And who is all concerned?

"*A.* Why, both ourselves and Loveland & Hinyon Company, and we felt that the railroad company."

On cross-examination he testified as follows:

"We entered into a joint account arrangement with Loveland & Hinyon Company about August 18th. That may not be the exact date, but it is around that time; at the beginning of the shipping season or a day or so earlier. Under our agreement with Loveland & Hinyon Company we were to buy the peaches through our agents from the growers, and the peaches were to be shipped in the name of Loveland & Hinyon Company to their customers, and the profits and losses divided equally after certain agreed charges were made; the charges were a labor charge, and a charge for the cost of the baskets, and incidental charges. The profits were to be divided equally. We paid for these peaches, and then invoiced on Loveland & Hinyon Company for them, and then they sent us on the money, and the value of the whole account was to be adjusted at the end. In reality they provided the money except for a short interval; that is, I should still further qualify that they provided the money for that portion that we shipped except for a short interval. * * *

"*Q.* Are you interested in the suit of Loveland & Hinyon Co. v. Pere Marquette?

"*A.* Yes, sir.

"*Q.* What is your interest in the outcome of the suit?

"*A.* We are interested in whatever may be recovered on the shipments in which we are interested in that joint account arrangement as I told you.

"*Q.* Shipments of peaches out of Fremont?

"*A.* And Ludington and other points where the joint account may have—where peaches may have been shipped for this joint account. * * *

"*Q.* State whether Loveland & Hinyon were interested in the peaches which you bought in the open market.

"*A.* They were.

"*Q.* As the season progressed?

"*A.* Yes, sir.

"*Q.* State whether they were interested in the peaches that were bought under contract from these growers.

"*A.* They were.

"*Q.* Then they were interested in all the peaches that you bought during that season?

"*A.* All that we bought at Fremont, and a portion that we bought at Ludington and other points."

On redirect examination he testified:

"*Q.* Calling your attention to your testimony as to paying for these peaches, and then invoicing to Loveland & Hinyon Company, how did you arrive at the price at which the canning peaches were to be paid for?

"*A.* We arrived at the price at which the canning peaches were to be paid for with Loveland & Hinyon by calculating at the time the contract was made the probable cost of the peaches suitable for filling the orders then on our books, and the price was based upon $1 a bushel for the best varieties and the best fruit. We then determined about what prices fruit would be expected to cost us for the different grades that we were to pack or that we might pack in the ordinary course, one year with another, and we fixed the price as 70 cents per bushel for the yellow peaches that we might use in the factory and 50 cents for the white peaches. We paid these prices to the joint account throughout the season, and this is the price we paid for peaches which became soft, and which we ran through the factory; yes, sir. * * * My object in buying peaches on the open market during the season of 1911 was to carry out the spirit of our contract with Mr. Hinyon, and also to reduce the average cost of our fruit, and increase our chance of profit. * * * Some of the peaches shipped by the Fremont Canning Company were billed Fremont Canning Company, some Loveland & Hinyon Company. * * *"

Rebuttal:

"Now, according to the contract with Loveland & Hinyon Company on our joint account arrangement,

the canning factory was to use whatever peaches it required, and we were to pay for those peaches at the rate of 70 cents a bushel for yellow peaches and 50 cents a bushel for white, which was the average price that we presumed at the beginning of the season that this fruit would cost us under the conditions that we then expected."

Recross-examination on rebuttal:

"Q. And those were all bought from what?
"A. The joint account.
"Q. At what price?
"A. 70 cents for yellows and 50 cents for whites.
"Q. And what is the average price?
"A. Chargeable to the joint account?
"Q. No; what is the average price of the peaches which you purchased from the joint account?
"A. Oh, 67.55 cents.
"Q. Is that the estimate upon which you made your basis of loss in this case?
"A. Yes, sir."

As tending to show what parties made the contract, the following testimony of the witness Frank Frisby, local station agent of the defendant at Fremont during August and September, 1911, appears to be pertinent:

"The Fremont Canning Company placed orders for refrigerator cars with me part of the time during those months, but most of the time with my operator. * * * We had written forms at all times; but it is handier for the shipper, I suppose, to use the phone, or tell us at the time when they may happen in the office. I accepted these orders; yes, sir. I didn't refuse an order because they were not written on blanks; no, sir. When orders came in they were placed on file, and between the hours of 5 and 6 were wired to our car distributor at Grand Rapids. * * * I have not the record of the time these refrigerator cars ordered by the Fremont Canning Company were placed; no, sir. * * * I know in a way about the orders given by the Fremont Canning Company for refrigerator cars during the peach season of 1911. There were times when that was not entirely

filled. \* \* \* I was over to the office and around the plant of the canning company during some of the time."

The following order was received in evidence:

"September 7th, 1911.
"FRANK FRISBY, Agent Pere Marquette R. R.
"Fremont, Mich.
*"Dear Sir:*
"Please enter our order for eight (8) full ice refrigerator cars for delivery tomorrow.
"Yours respectfully,
"FREMONT CANNING COMPANY,
"FRANK GERBER, Manager."

Upon the trial the plaintiff introduced in evidence certain carbon copies of letters written by Mr. Gerber, its manager, to the railroad commission. The witness testified as follows:

"About that time I took the matter up with the railroad commission.
*"Plaintiff's Attorney:* I show you that paper and ask you what it is.
*"A.* A copy of a letter that I wrote to the railroad commission, carbon copy.
*"Q.* Whether or not there was more than one carbon copy made of that?
*"A.* Yes.
*"Q.* And, if so, to whom was it sent?
*"A.* To Mr. Hartenstein, the superintendent of the P. M.
*"Q.* Whereabouts?
*"A.* Grand Rapids.
*"Plaintiff's Attorney:* I offer this in evidence.
*"Defendant's Attorney:* We object to the letter being introduced in evidence, because it is not the first evidence.
*"The Court:* It will be received.
*"Defendant's Attorney:* An exception.
*"The Court:* Let me understand you, your objection is because this is not addressed to the P. M. Railroad Co.?
*"Defendant's Attorney:* That is one objection.
*"The Court:* What is the other?

"*Defendant's Attorney:* The first objection was that that is not the original, and the original not accounted for. The other objection is that it has absolutely nothing to do with this case; it is immaterial.

"*The Court:* I understand you are called upon to produce a carbon copy which was sent to your company?

"*Defendant's Attorney:* We were called upon to produce a carbon copy, which would be no more admissible than that copy.

"*The Court:* That is a matter of argument. You were called upon to produce the copy, were you not?

"*Defendant's Attorney:* The carbon copy of the original.

"*The Court:* All right, it will be received."

The first letter was as follows:

                                        "August 28, 1911.
"MICHIGAN RAILROAD COMMISSION,
                    "Lansing, Michigan.
"*Gentlemen:*
    "File X—2964.
    "Replying to your favor of the 25th, beg to advise that up to this time we have not seen Mr. Hartenstien, nor have we received any communication from him, since writing you on Aug. 24th.

    "While we have no official information, it is reported that a special fruit service was to be inaugurated this morning, and we are informed that this train left Muskegon early this morning, but was delayed by an engine failure near Holton, so that up to this hour, 1:40 p. m., this train has not arrived here. We also understand that the local freight train due here at 10:00 a. m. had not left Muskegon at a late hour this forenoon. This, from our point of view, does not look like any improvement in the service; but we appreciate that the troubles this morning may be due to accidents which could not be avoided.

    "We are very much in hopes that this matter may work out all right; but the relief must come within the next day or two, or very serious losses will result. We will write you every day advising you regarding the service, until such time as the trains are running satisfactorily, and will send copies of our letters to Mr. Hartenstein. Of course, if conditions are no bet-

ter tomorrow than they are today, we will communicate with you by telephone or telegraph, and in the meantime we remain,

"Yours respectfully.

"Copy to Mr. Hartenstein, Supt."

Other similar letters bearing date, respectively, August 29, 1911, September 5, 1911, and September 6, 1911, having been offered the following occurred:

"*Defendant's Attorney:* The same objection, may it please your honor. I presume the objection I took before will cover these letters, will it?

"*The Court:* It may cover them, if you wish it to. They will be received.

"*Defendant's Attorney:* The same objection. There is nothing appears here that a copy of these letters has ever been brought to the attention of the railroad company.

"*The Court:* I understand the witness testified that they were.

"*Defendant's Attorney:* He has testified that he sent them there. There is nothing here of record to prove that they have been brought directly to the attention of the railroad company.

"*The Court:* Submitted to the due course of mail, were they?

"*Witness:* Yes, sir.

"*The Court:* Directed to Mr. Hartenstein?

"*Witness:* Yes, sir.

"*Defendant's Attorney:* Save an exception."

### Second Count.

Under the second count, as amended upon the trial, the plaintiff sought to recover damages which it claimed it had sustained by reason of the fact that the defendant unreasonably delayed in transit cars which had been delivered to it, containing baskets, and consigned to the plaintiff. The evidence tended to show that there were 12 such cars. The numbers and initials, the point of shipment, the bill of lading and date of shipment, the date of their arrival according to defendant's wheel report, the number of

days in transit, the distance traveled, and the miles per day that the cars made were put in evidence before the jury.

It was the claim of the plaintiff that most of these cars were unreasonably delayed in transit, by reason of which it sustained a loss by having to buy other baskets and go to a large expense of express charges, etc., and the expense of cartage from other towns, etc., to get other baskets on account of the delay of the cars in transit. In determining the time, and in showing the delay, the court permitted the bills of lading to be introduced in evidence as tending to show the dates when the shipments commenced, and the points of shipment; and the defendant's wheel report, or record, was also put in evidence as to the dates the cars arrived in Fremont.

The reception in evidence of the bills of lading over the objection and exception of defendant's counsel is urged as reversible error. It appeared that most or all of the bills of lading had been received by the plaintiff by mail from the consignors. The objection of the defendant was that the bills of lading were unproved, that their genuineness was not shown, and that they might have been filled out by anybody, and that it was just as necessary to prove their genuineness as it would be to prove the genuineness of an original letter before it was received in evidence, and that the same constituted a contract, if valid. It should be stated that accompanying the bills of lading were freight bills for the charges purporting to be issued at the Fremont station of defendant, and to be an account of the plaintiff with the Pere Marquette Railroad Company, in which the billing station was given, and the waybill number and date, which corresponded with the bills of lading. These freight bills appear to have been receipted by the defendant company, and there is some question whether

the objection to these freight bills was because of lack of genuineness, or whether that objection was specifically called to the attention of the court, although it appears that defendant's exception was announced as covering all the papers.

The testimony upon the question of damages on account of the failure of the plaintiff to get the baskets within a reasonable time tended to show that the plaintiff had suffered damage in the sum of $338.85, as testified to by the witness Gerber. It included the amount expended for express charges, certain charges for hauling the baskets from Grant, Holton, and other points where it was claimed the plaintiff had to go to obtain the baskets, also storing charges for having to provide for the storage of the baskets finally brought in by defendant, which came too late to be used that season, as well as an item of interest.

### Third Count.

The third count was based upon a claim of the plaintiff that the defendant wrongfully failed to place a car load of cans, which arrived on August 22d, at a place where they could be unloaded by the plaintiff; it being claimed that the car was placed upon a siding, at a distant point not accessible to the plaintiff, and that it was not placed upon the plaintiff's siding until 5 o'clock p. m. of August 24th. The evidence tended to show that the agent's attention was called to this, as well as the superintendent's office at Grand Rapids, and that by reason of this delay the fruit which was intended to be placed in the cans was greatly depreciated; the plaintiff claiming a damage of 30 cents a bushel, or $51, as the total amount of damage under this count.

The trial resulted in a verdict and judgment for the plaintiff in the sum of $2,043.88, the exact amount claimed by the plaintiff in its evidence.

There was a motion at the close of the plaintiff's

case, made by the defendant, for a directed verdict in its favor, and also another like motion at the close of the testimony in the case, both of which were denied, and exceptions taken.

There was a motion by the defendant for a new trial, upon the grounds that the plaintiff wholly failed to make out a cause of action against the defendant, as alleged in its declaration, or any count thereof; because the evidence offered and received upon the trial of the cause wholly failed to support the allegations of plaintiff's declaration, or any count thereof; because the entire evidence offered and received at the trial of said cause did not prove a cause of action against the defendant; because there was no proof in the case to sustain the verdict of the jury; that the verdict was not supported by the evidence offered and received in the trial of the cause; because the verdict of the jury was against the weight of the evidence offered, and was contrary to law, and against the just rights of defendant; because the amount of damages assessed by the jury was excessive, and not sustained by the proof; because the court erred in not granting defendant's motion to direct a verdict; because the evidence wholly failed to show that the defendant was guilty of any negligence which was the direct or proximate cause of defendant's damages; and because the court erred in submitting the case to the jury under the pleadings and proofs in the case.

This motion for a new trial was denied, and the reasons given for denying the same were duly excepted to by the defendant. Defendant has brought the case here upon writ of error, and there are 86 assignments of error in the record. These have, however, been classified, and will be considered under the different heads presented by the appellant.

1. It is the claim that, under the undisputed facts in the case, if there is a cause of action at all, it is

in favor of the joint account arrangement between the Fremont Canning Company and Loveland & Hinyon Company.

We think that the evidence in the case clearly shows that a contract with the defendant for the furnishing of these refrigerator cars was made with the Fremont Canning Company, the plaintiff. The orders were given by the Fremont Canning Company, and were accepted by the defendant, and there was a contractual relation between the plaintiff and the defendant for the furnishing of the cars. We think the law of this question has been settled by this court in the following cases: *Sisson* v. *Railroad Co.*, 14 Mich. 489 (90 Am. Dec. 252); *McRoberts* v. *Lyon*, 79 Mich. 25-31 (44 N. W. 160); *Wolkins* v. *Knight*, 134 Mich. 347-349 (96 N. W. 445).

It should be borne in mind that the peaches which were canned, and on which it is claimed the damages arose, were not joint account peaches, but belonged to the plaintiff; the plaintiff having the right to take peaches from the mass for canning. But we think the fact controlling that, the contract having been made with the plaintiff, the cars were not ordered by the joint account, but were ordered by the plaintiff. We do not think that there was any error committed by the trial court upon this point.

2. It is next contended by the appellant that, even if the Fremont Canning Company were a proper party plaintiff, there can be no recovery, because cars were furnished within a reasonable time, as appears by the evidence.

By section 8 of Act No. 300 of the Public Acts of 1909 (3 How. Stat. [2d Ed.] § 6531), it is provided as follows:

"Every railroad shall, when within its power so to do, and upon reasonable notice, furnish suitable cars to any and all persons who may apply therefor, for the transportation of any and all kinds of freight

in car load lots. Every common carrier shall have sufficient cars and motive power to meet all requirements for the transportation of passengers and property which may reasonably be anticipated. In case of insufficiency of cars at any time to meet all requirements, such cars as are available shall be distributed among the several applicants therefor, without discrimination between shippers, or between points of shipment, whether competitive or noncompetitive: *Provided,* preference may be given to shipments of live stock and perishable property."

A thorough examination of the testimony in the case and the authorities cited by counsel satisfy us that a question of fact was here involved, and that the same was properly submitted to the jury by the trial court.

In its charge to the jury the court, after quoting the statute above referred to, said:

"It is not disputed but what the canning company in this case placed their orders with the Pere Marquette Railroad Company from time to time for the cars, that is, for a certain number of cars; there is no material dispute as to the number of cars they ordered upon a given date. The dispute is whether those cars were furnished, and, if they were not furnished, whether there was a reasonable excuse for not so furnishing those cars. * * *"

After again alluding to the statute, the court said:

"This we must concede was perishable property. Now, gentlemen, you must take into consideration the duty of the railroad company under this statute. Their duties are not confined to the village or city of Fremont, nor to the furnishing of cars to the Fremont Canning Company. Their duty is to all shippers of that class, as well as every other class. They cannot discriminate. They cannot give preference. They must treat all alike. Now, in your deliberation of the testimony in this case, you must bear that carefully in mind that the Pere Marquette Railroad Company is a common carrier undertaking under the laws of this State to serve the whole people of this locality,

the whole people of the locality which is covered by their system, not by one division of that system, but by the whole system; bear that carefully in mind, that they have a duty to perform to all who are in the business of shipping."

Referring to the first count of the declaration, the court charged the jury as follows:

"I charge you that it was the plaintiff's duty when the cars did not arrive on the days for which they were ordered, if you find this to be the fact, to do everything in its power to take care of the peaches which could not be shipped because of the failure to furnish cars, and if you find from the evidence that the plaintiff, in good faith, and for the purpose of taking care of the peaches, and doing all it could to prevent loss, used the peaches in its canning factory, and that said peaches had deteriorated in value because of the failure to furnish refrigerator cars, and if you find from the evidence that the plaintiff did sustain damage in using peaches in their deteriorated condition, then you must determine from the evidence what that damage was, and return a verdict for the plaintiff for that amount.

"I charge you that the measure of the plaintiff's damage in this case, if you find that the plaintiff is entitled to recover, is the loss it sustained by reason of using soft peaches in the factory, instead of using peaches in good condition, if you find that the peaches became soft because of the failure of the defendant to furnish refrigerator cars. Mark that, gentlemen, that is important.

"I charge you that it is no defense to this action that the defendant did not have any refrigerator cars of its own, and obtained its refrigerator cars from the Armour Car Lines. If the defendant accepted orders for refrigerator cars to be placed at Fremont in the season of 1911, it was its duty to furnish them, regardless of the fact that it did not own them itself; and therefore, it is no defense that it could not get these cars from other people when it wanted them, or that it didn't have them itself.   *   *   *

"I charge you that it is no defense if these cars had to be iced by any company or persons; it would be no defense to this company if the persons who were

to furnish the ice for the cars failed or refused or were unable to furnish the ice.   *   *   *

"I charge you that the fact, if you find it to be a fact, that the defendant placed more cars at Fremont during the entire season than the plaintiff had ordered for the entire season, this fact will not excuse the defendant, if it did not furnish the cars on the dates for which they were ordered, if you find that the defendant had reasonable notice to furnish the cars, and it was within its power so to do."

At defendant's request, the court charged the jury as follows:

"No. 7. I charge you that the defendant cannot be held liable for inability to furnish cars, when furnishing the same would interfere with the general business of the company and the rights of the shippers."

"No. 12. I charge you that the defendant cannot be held liable in this case, if you find that it was unable to furnish cars ordered by the plaintiff, because of a sudden and unusual press of business, or if prevented from so doing by wreck or derailment, or by storm, which destroyed the telegraph service, or by a strike or refusal of the men engaged in icing cars to ice the same in time so that the cars could be transported and delivered by the defendant at the time requested by the plaintiff. I qualify that, gentlemen, No. 12, by saying that that does not go to the original instance, but it is something that must be overcome by them, and you are allowed to consider that proposition showing the delay of such number of cars as might have been interfered with on that account, no more and no less."

"No. 22. I charge you that if you believe from the evidence that the defendant has met and overcome the presumption of negligence established by the plaintiff and has excused its failure to promptly furnish refrigerator cars, your verdict must be for the defendant. That would apply to the first count."

We think that a question of fact was here involved, and it was properly submitted to the jury, whether the cars were furnished within a reasonable time.

3. The next point urged by appellant is that the plaintiff's damages are too remote and speculative.

We are unable to agree with counsel in this position. The evidence offered by the plaintiff tended to show that, instead of visiting upon the defendant the full amount of damages which might have been claimed by the plaintiff, to wit, the entire loss of the peaches because of the failure of the defendant to furnish refrigerator cars, the plaintiff sought to minimize the damages, and make them as small as might be, and in so doing used the defective peaches for canning purposes. It is the claim of the plaintiff, however, that in so doing a larger quantity of peaches were necessarily used because of their damaged condition, and that the difference in amount, as testified to by the witness Gerber, is claimed for damages in the case. It further appeared that the testimony of the witness Gerber was based upon his prior experience there as manager of the plaintiff company, and is shown by the following excerpt from his testimony:

"*Q.* I want you to explain to the jury how you arrived at the amount of damage you sustained on account of these peaches which you canned were overripe.

"*A.* Our only method of arriving at that was by a comparison with the results of previous years when conditions were about normal, and we have to know about the amount of fruit required for a case which we figure the unit of, each different class of product.

"*Q.* Did you prepare an estimate of the pack of 1910?

"*A.* Yes, sir.

"*Q.* Did you prepare a record of the pack in 1911?

"*A.* Yes, sir."

To this class of testimony the defendant objected, on the ground that it was incompetent, irrelevant, and immaterial, and for the further reason that it was too remote; that what comparisons may have been made in other years had nothing to do with the case.

The court said:

"I understand that that is confined—you are now speaking of 1910, and all the fruit, do I understand, in 1910, was in normal condition for packing when packed?

"*Plaintiff's Attorney:* That is our theory, your honor.

"*Witness: A.* Yes; I figured a normal season.

"*The Court:* And it is the season immediately preceding the one that they claim there was a loss suffered by reason of not being a normal condition. I will receive it."

The further objection was then made that it was too remote and speculative. The objection was overruled, and exception taken. We do not think that the defendant is in a position to complain of the rule or measure of damages adopted in the case.

4. The next objection urged by appellant is that the court erred in the admission and exclusion of testimony, and in the charge. Complaint is specifically made here that the plaintiff offered in evidence, and the court received, over the objection of defendant's counsel, certain letters, above referred to, written to the Michigan railroad commission. It is urged that the letters received were carbon copies of letters written by the plaintiff to the railroad commission. The objection to their introduction was: *First,* that they were not the best evidence because not the originals, and the originals not accounted for; *second,* that they were irrelevant, and had nothing to do with the case, and were immaterial. A carbon of an original may more appropriately be called a duplicate than a copy.

We have looked in vain for any objection that these letters were incompetent, or were self-serving statements, and therefore inadmissible in evidence. Certainly, from an examination of this record, it cannot be said that the attention of the court was challenged

to this point.  Manifestly, the letters were material, and had something to do with the case, and it seems to us that it was the duty of defendant's counsel to have directed the attention of the court to their incompetency, and to the fact that they may have been self-serving statements.  They covered matters that were fully testified to by the witness Gerber, and this witness was subjected to a thorough cross-examination.  We find no objection or exception sufficient to warrant us in saying that the reception of the letters in evidence was reversible error.

### Second Count.

1. The first objection urged is upon the admission of testimony under the second count.  It is the claim, under this objection, that the plaintiff was permitted to and did introduce in evidence a number of bills of lading to cover the cars in question, without first showing that they were genuine bills of lading, or contracts made by the defendant.

It is our opinion that these bills of lading when first offered, their genuineness not having been proved, were incompetent as tending to prove the dates on which the cars and baskets were delivered to the defendant for transportation.  These bills, however, were accompanied by freight bills, one of which was as follows:

"Freight bill.  Date of issue, August 14, 1911. Consignee, Fremont Canning Company.  Freight Bill No. 650.  Issuing station, Fremont.  To Pere Marquette Railroad Co., Dr., for charges on articles transported.  Billing station and route, New Richmond. Waybill number and date, 12, 8/11.  Car initial and number, C. B. & Q. 104861.  Number of packages, articles, and marks.  Baskets.  Weight, 20,000.  Rate, 8½.  Freight charges, $17.00.  Received payment for the company 8/15, 1911, F. Frisby, Rx Agent.  Total, $17.  Stamped on it Fremont Canning Company, Paid August 15th, 1911."

This accompanied the following bill of lading:

"Pere Marquette Railroad Company. Straight Bill of Lading—Original—Not Negotiable. Received subject to the classifications, at New Richmond, Michigan, August 11th, 1911, from E. E. Weed & Company. Consigned to Fremont Canning Company. Destination, Fremont. Car initial, C. B. & Q. No. 104861. Car baskets; weight, subject to correction, 20,000. Class or rate, 8½. E. E. Weed & Company, Shippers. W. E. Johnson, Agent."

Here we have accompanying the bill of lading the freight bill purporting. to be receipted in full by the defendant company. We have been unable to find by any specific objection that the genuineness of this receipted freight bill was challenged by defendant's counsel, or that the attention of the court was called to the fact that its genuineness had not been proven. It cannot be said, therefore, that that objection was made. We think that any error which there might have been in ruling that the bills of lading were receivable in evidence was cured by the fact that they were finally accompanied by the receipted freight bills virtually covering the same ground, and containing the same statements. We are of opinion that there was no reversible error in the admission in evidence of the bills of lading and freight bills accompanying them.

2. It is next urged that the cars were moved with reasonable dispatch. This, we think, became a question of fact, and was properly submitted to the jury in the charge of the court. Upon that subject the court charged the jury as follows:

"As to the plaintiff's claim under the second count, I charge you that it is for you to determine from all the evidence in the case whether there was any unreasonable delay in the movement of the cars containing baskets from the various stations from which they were shipped to the plaintiff at Fremont, Mich. And if you find that there was a delay in the movement

of these cars, or any of them, then you must determine from the evidence in the case whether or not the plaintiff was damaged by such delay; and, if you find that the plaintiff was so damaged, then you must determine the amount of its damage from the evidence in the case.

"I charge you that, if there was an unreasonable delay in the movement of the cars of baskets, then the plaintiff was justified in obtaining baskets from any source from which it could obtain them, using due diligence, its best efforts, and good faith to obtain the same at the least expense possible, and then you will determine from the evidence whether or not it suffered any damage in getting such other baskets, and in keeping said baskets on hand after the season was over, and this amount you will find and return a verdict for the plaintiff. That is qualified, gentlemen, to the expense of recovering other baskets.

"I charge you that the plaintiff is not seeking to recover in this case for any difference between the price that it had to pay for baskets from other parties and the price which Weed & Co. would have furnished baskets to it for. They are not undertaking to recover for that at all. The plaintiff claims that it has been injured and damaged because the defendant unreasonably delayed the movement of the basket cars, and that it had to go to extra expense to get baskets for that reason.

"If you find from all the evidence that the plaintiff is correct in its claim, then you will determine the amount of the damage which it has sustained, and include such amount in your verdict."

3. As we understand counsel, the claim is here made that Loveland & Hinyon Company were interested in this basket transaction, and therefore the plaintiff cannot recover. We have already covered that point in discussing the first count.

### Third Count.

We are of opinion that the court did not err in submitting the case under the evidence relating to the third count of the declaration.

An examination of the other assignments of error

leads us to the conclusion that there is no reversible error in the record. We do not think that it can be said that there was no evidence to support the verdict and judgment, nor that the amount of recovery was excessive. It is true that the recovery was for the identical sum claimed by the plaintiff in the case; but there was evidence to support it. This was a question for the jury. We cannot say that the verdict was against the weight of the evidence.

The judgment of the circuit court is therefore affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OS-TRANDER, and BIRD, JJ., concurred. MOORE, J., did not sit.